# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:13-cr-379-TCB-AJB** |
| **EUGENE THOMAS CHUNG** | ) | |
| *a/k/a* **Yoo Jin Chung,** | ) | |
| **JONG SUNG KIM** | ) | |
| *a/k/a* **John Kim, and** | ) | |
| **THOMAS JUNGWON LEE,** | ) | |
| *a/k/a* **Tommy Lee.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are the following pretrial motions filed by Jong Sung Kim ("Kim"): motions to suppress statements, [Docs. 77, 99], motion to sever counts, [Doc. 170], and motion to sever defendants due to *Bruton*, [Doc. 75]. In response to the *Bruton* motion, the Court directed the Government to file proposed redactions, [*see* Doc. 175], to which Kim, Thomas Jungwon Lee ("Lee") and Eugene Chung ("Chung") filed objections, [Docs. 184 (Kim), 185 (Lee), 186 (Chung)]. The Court held an evidentiary hearing on Kim's statements, [Doc. 276 (hereinafter "T_")], after which the parties filed briefs. [Docs. 292 (Gov't), 301 (Kim)]. With briefing completed, the motions are ready for a recommended resolution.

## I.   *Kim's Motions to Suppress Statements, [Docs. 77, 99]*

### A.   *Facts*

Kim is charged in a second superseding indictment with conspiring with his codefendants and others to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a), (Count One), and also with committing or aiding and abetting three substantive Hobbs Act extortions, (Counts Three, Five and Six).  [Doc. 259]. When he was arrested on the original indictment, Kim was interviewed by several FBI special agents.  One of the questioning agents is regularly used by the FBI in Asian gang investigations; as a result, his identity was disclosed to defense counsel but his real name was not used during the evidentiary hearing, where he was identified in the transcript simply as "Agent."  T7-9.[1]  Agent acted in an undercover capacity in the investigation of other defendants and other subjects, although he subsequently interviewed witnesses and defendants.   T10, 48-49.   Agent was tasked with interviewing Kim since Agent had not dealt with him during the investigation.  T12. Agent was assisted in questioning Kim by FBI Special Agent Doy Kim (hereinafter "Agent Kim").  T12.  That questioning is the subject of the motions to suppress.

---

[1]      At the time of the hearing, Agent had been an FBI agent for twenty-five years, and investigated organized crime, violent crimes, drug investigations and public corruption.  T10.

2

On September 19, 2013, at just after 6:00 a.m., Defendant Kim was arrested at his home in Suwanee, Georgia.  T11-12.  Agent did not witness the entry and takedown since he was around the corner from Kim's front door, about seventy to eighty yards away.  T22-23.  When Agent entered the residence, Kim already was in handcuffs and was sitting in the living room in the presence of ten to twelve armed law enforcement officers dressed in tactical raid gear.  T23, 24, 25.

Kim was transported to the FBI's Buckeye Building to be questioned.  T12. Questioning began at about 7:20 a.m.  T13; Gov't Ex. 1.  The room in which he was questioned was ten by twelve feet.  T34.  The questioning was not audio- or video-recorded because the questioning occurred before the FBI changed its policy about recording custodial interviews.  T18.

Defendant Kim was handcuffed in the front.  T13, 46.  He did not voice any complaints about the handcuffs.  T59-60.  Although Agent was not armed, Agent did not know whether Agent Kim had a firearm with him.  T19, 34.  Agent and Agent Kim identified themselves.  T14.  They said they wanted to talk to Kim about Eugene Chung and his associates.  T35.  Agent Kim read Kim his rights in English, and translated each line into Korean.  T14, 15.  After going over the form with him, Agent Kim had Kim

3

place his initials next to each right described on the form indicating his understanding

of that right.  T15, 16, 33.  The form provided, in relevant part:

FEDERAL BUREAU OF INVESTIGATION
ADVICE OF RIGHTS

Place: *Atlanta, GA*          Date: *9/19/13*        Time: *7:20 AM*

YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any
questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any
questioning if you wish.

If you decide to answer questions now without a lawyer present, you have
the right to stop answering at any time.

CONSENT

I have read this statement of my rights and I understand what my rights
are.  At this time, I am willing to answer questions without a lawyer
present.

Signed:      *S/ Jung Sung Kim*

4

WITNESS

Witness:       *s/ Agent*
Witness:       *s/ Agent Kim*
Time:          *7:22 AM*

Gov't Exh. 1.  Both agents signed as witnesses.  Gov't Exh. 1; T14-15, 16-17.  Kim

agreed to speak with the agents.  T15.  The questioning took place in a combination of

Korean and English.  T18.

Although he was not advised by Agent or Agent Kim of the charges in the

indictment, Kim was advised through the questioning that he was suspected of

committing extortion, and in response to those allegations, Kim denied that he extorted

anyone.  T25-26.  In the early part of the questioning, Agent interpreted Kim's

exculpatory statements as denials and not just due to poor memory of the events.  T27.

Towards the middle of the interview, the agents asked Kim to cooperate, but Kim stated

that he already was telling the truth.  T37-38.  He was told that his cooperation would

be passed along to the prosecutors.  T40.  When Kim denied being present when

Victim No. 1 had his nose broken, and Agent and Agent Kim believed that he was

minimizing his association with Chung, they told him that they knew that he was

present when Victim No. 1 was hit and also that he was facing twenty years.  T26, 29-

31, 53-54.

5

The co-case agent, Special Agent Bill Gant, and Task Force Officer Sung Kim (hereinafter "TFO Kim") joined the interview at about 8:00 a.m., after Agent and Agent Kim had exited the interview room to seek out agents with more familiarity about the case, specifically the assault that occurred at a bar in December 2009.  T19, 43-44, 45, 59.[2]  After Gant joined the questioning, the questioning was conducted only in English and Kim exhibited no difficulty in understanding English.  T46-47.

Gant told Kim that they already knew what happened and that it was in his best interest to tell the truth.  T44, 45.  Kim also was told that Chung or others were present and talking to agents and telling the agents "what really happened."  T32-33.[3]  In trying to get Kim to cooperate or admit his involvement, the agents did not raise their voices or bang on the table.  T39.  Thereafter, Kim told them what happened at the bar that night.  T44.  He also stated that he received money from Victim No. 1, but he denied that it was extortion, but rather the money received was lawfully owed to Chung.  T55, 57-59.

---

[2]      Gant and TFO Kim were carrying weapons but they were concealed under clothing.  T46.  The bulge from TFO Kim's weapon, however, was visible.  T48.  Gant was wearing a polo shirt with an FBI shield emblem on it.  T48.

[3]      It was likely that Kim saw other defendants (but not Eugene Chung, who was arrested the previous day) as they were walked by the interview room or in the fingerprint section of the FBI office.  T51.

AO 72A
(Rev.8/82)

Agent described Kim as not confused or intoxicated, nor did he appear to not understand what was happening.  T17.  Kim did not tell the questioners that he was intoxicated.  T41.  He was given water to drink.  T17; *see also* T45 (Gant describing Kim as calm, lucid, and alert, and drinking water).  There were no threats or promises made by the agents, and Kim did not state that he wanted to stop talking or that he wanted to talk to a lawyer.  T19-20, 45.  The questioning ended when the agents concluded they were at a "dead end."  T20, 37.  The questioning lasted a little more than one hour.  T18.[4]  After the interview, Kim was allowed to smoke, but a cigarette was not withheld in exchange for his cooperation.  T40.

### B.   *Parties' Contentions*

In his initial motion filed before the evidentiary hearing, Kim alleged that he was subjected to an illegal arrest, that he did not knowingly and voluntarily waive his *Miranda* rights, and that his subsequent statements were not voluntary.  [Doc. 77 at 1-3].  In his pre-hearing supplemental motion, he asked the Court to determine whether

---

[4]      After the questioning, when he was being transported to U.S. Marshal's lockup, Kim stated to Gant that he had a lot of good information.  Gant told him that when he got to court he should talk to his attorney, who then could talk to the Assistant U.S. Attorney and "maybe we can work something out."  T51-52.

there were legal grounds for his arrest, and argued that his *Miranda* rights were not properly waived or his statements voluntarily obtained.  [Doc. 99 at 3].

In its post-hearing brief, the Government first argues that Kim was arrested on a warrant issued following the return of the original indictment, and thus he was legally arrested.  [Doc. 292 at 8].  It next argues that Kim's post-arrest statements were knowingly and voluntarily given.  It claims that the agents advised him of his *Miranda* rights after confirming that he wanted to speak with them; Kim understood that he was going to be questioned; he was read the *Miranda* waiver form, signed it and orally consented to waive his rights and be questioned; the questioning was of short duration; and was conducted in a clam, civilized and polite manner.  [*Id.* at 9].  With regard to Kim's *Miranda* waiver, the Government argues that Kim was not questioned until the agents identified themselves, he was advised of his *Miranda* rights in English and Korean, he initialed each right on the form reflecting that he understood the rights and wished to waive them, signed the form indicating that he wished to speak with the agents, and orally acknowledged that he was waiving his rights and willing to answer questions in the absence of a lawyer.  [*Id.* at 12].

The Government also submits that his statements were voluntarily obtained.  It argues that none of the factors demonstrating coercion, as outlined by the Supreme

8

Court or the Eleventh Circuit, is present in this case. [*Id.* (citations omitted)]. The Government contends, first, that Kim was not confused or intoxicated, was described as calm, lucid, and alert, he understood what was happening, was given water, and was allowed to use the bathroom if needed. [*Id.* at 13 (citing T17, 45, 46-47)]. It also points out that he did not ask for a lawyer or seek to stop the questioning. [*Id.*]. Second, it submits that the agents did not coerce him. The arrest occurred without incident, and the interview was conducted by agents wearing plain clothes with their firearms hidden. There were no promises made to him nor did the agents threaten him, bang on the table, or raise their voices even when they believed he was lying. Instead, the Government contends, they merely implored him to tell the truth. [*Id.* at 13-14]. The Government also argues that Kim knowingly and voluntarily waived his right to counsel for the same reasons it stated with regard to his waiver of his Fifth Amendment rights.

Not surprisingly, Kim paints a different picture and points to conditions that he claims caused his *Miranda* waiver and subsequent statements to be involuntary. He starts with the circumstances of his arrest by twelve armed agents wearing paramilitary tactical gear, who handcuffed him and did not advise him of the charges. [Doc. 301 at 2]. He further argues that he was transported to the Buckeye

Building where, again, he was not advised of the charges against him and in only two minutes the rights hurriedly were explained to him and he purportedly gave up his rights. [*Id.* at 3]. He then contends that he was questioned by the two agents about an event that occurred nearly four years before, and the agents did not record the interview although they had the capability to record it. [*Id.*]. He argues that it is natural that his memory about these events would not be good, but his answers did not match the agents's preconceived version of the facts, and so they "threatened" him by telling him he faced twenty years in prison, which Agent described as a technique " 'to get the truth out of him.' " [*Id.* (citation omitted)]. He then contends that because Agent and Agent Kim did not know the details of the investigation about an assault on Victim No. 1 at the Gah Bin bar in December 2009, and Kim denied that he was in the room when that assault occurred, the agents brought in Gant, the case agent, and TFO Kim to continue questioning Kim. These agents were armed and they "persisted in their mission of having [Kim] admit the 'facts' they had already determined to be true," by telling him that they " 'already know what happened.' " [*Id.* at 4 (quoting T44)]. Gant and TFO Kim proceeded to tell Kim that his co-defendants were talking and in fact the agents allowed Kim to see his co-defendants being walked by. After thirty minutes of

10

additional questioning, Kim admitted that he received money from Victim No. 1 for Chung, but that it was for a lawful debt. [*Id.* at 4-5].

Kim argues that since he was in custody and thus entitled to *Miranda* warnings, the Government did not satisfy its burden to establish a valid *Miranda* waiver. First, despite the written waiver, he contends that the waiver process was not recorded, and argues that failure amounts to a due process violation. [*Id.* at 8 & n.1].

Second, he argues that the waiver form was insufficient to demonstrate a waiver of his self-incrimination rights because while it stated that he understood his rights, it only stated that he would answer questions without a lawyer present, and not that he was waiving his Fifth Amendment rights. [*Id.*]. He submits that this limited waiver is confirmed by Agent's testimony that Kim only gave a single verbal "yes" at the end of his being advised of his rights, rather than waiving each individual right along the way. [*Id.* at 8-9 (citing T33)].

Kim next argues that his waiver was ineffective because he was not told the nature of the charges against him or the specific nature of the matters about which the agents wanted to question him. He cites *Carter v. Garrison*, 656 F.2d 68 (4ᵗʰ Cir. 1981), and *Schenk v. Ellsworth*, 293 F. Supp. 26 (D. Mont. 1968), in support

11

of his argument that, in order to be a valid waiver, the defendant must be advised of the charges or events the police seek to question him about.  [Doc. 301 at 10].

He also argues that the Government has not shown that his statements were voluntary.  Although recognizing that suppression is not warranted simply because, as a Korean citizen, he was entitled to have the Korean Embassy contacted on his behalf, he argues nonetheless that this is a factor to take into consideration in the voluntariness analysis.  [*Id.* at 11 & n.6].  In support of his argument that his statements were involuntary he contends that (1) he was taken in handcuffs out of his house to the FBI after having his home invaded by twelve armed agents wearing tactical gear; and (2) he was rushed into signing a waiver and interrogated for over one hour, and during the last half an hour he was interrogated by four agents, who threatened him with twenty years in prison if he did not give the answers they wanted.  [*Id.* at 12].

The Government did not file a reply.

## C.    *Legal Standards*

The Government bears the burden of showing by a preponderance of the evidence that a suspect's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156,

AO 72A
(Rev.8/82)

168 (1986); *Miranda*, 384 U.S. at 475; *United States v. Grimes*, 142 F.3d 1342, 1350 (11th Cir. 1998) (statements); *United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996) (*Miranda*); *see also United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005) (holding that the government must "prove by a preponderance of the evidence that the defendant waived his rights voluntarily, knowingly, and intelligently.").

Thus, when an individual is taken into custody and subjected to questioning, police must warn him prior to any questioning that he has the rights to remain silent and to the presence of an attorney. *Miranda*, 384 U.S. at 478-79; *Everett v. Sec'y, Florida Dep't of Corr.*, 779 F.3d 1212, 1240 (11th Cir. 2015), *cert. denied sub nom. Everett v. Jones*, 136 S. Ct. 795 (2016).   Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).  An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.  *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).  Thus, a waiver is effective where the totality of the circumstances reveal both an uncoerced

13

choice and the requisite level of comprehension. *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585). "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Johnson*, 379 Fed. Appx. 964, 968 (11th Cir. May 24, 2010).   However, a defendant need not understand all the consequences of the waiver.  He need only understand his right to remain silent or have his statements used against him. *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (to determine whether a waiver was intelligent, the court should "inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him.  . . .  A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver.").

Although the Government has a "heavy burden" to prove that a defendant's waiver was voluntarily, knowingly and intelligently made, *Miranda*, 384 U.S. at 475, which entails the proving of a person's subjective state of mind, the Court must rely on

14

the objective indicia of a defendant's mental state in order to determine whether a voluntary, knowing and intelligent waiver was made.  These objective indicators are that the defendant was informed in clear and unequivocal terms of each of his *Miranda* rights and that the defendant said, or by his conduct indicated, that he understood them and wished to waive them.  *United States v. Sonderup*, 639 F.2d 294, 297-98 (5th Cir. Unit A Mar. 13, 1981).[5]

The focus of the voluntariness-of-the-waiver inquiry is on whether the defendant was coerced by law enforcement into waiving his rights:  "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Connelly*, 479 U.S. at 170 (alteration and internal quotation marks omitted).  Courts consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the waiver.  *See Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988).  This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's waiver was the product of "an essentially free and unconstrained choice."

_____

[5]     In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, handed down prior to October 1, 1981. *See United States v. Todd*,   108 F.3d 1329, 1333 n.5 (11th Cir. 1997); *Limelight Productions, Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

*United States v. Garcia*, 890 F.2d 355, 360 (11ᵗʰ Cir. 1989). Among the factors considered are the suspect's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11ᵗʰ Cir. 2003); *Waldrop v. Jones*, 77 F.3d 1308, 1306 (11ᵗʰ Cir. 1996) (describing factors as including defendant's lack of education or low intelligence, failure to appraise the defendant of his rights, the length of detention, "the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.") (quoting *Schneckloth*, *id.*). However, while "a number of (non-exclusive) factors . . . may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *United States v. Gonzalez*, 71 F.3d 819, 828 (11ᵗʰ Cir. 1996) (citations omitted), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11ᵗʰ Cir. 2005); *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63

16

(11th Cir. 1984).  Under certain circumstances, police deception may invalidate an accused's waiver of his right to remain silent.  *See United States v. Estelan*, 156 Fed. Appx. 185, 194 (11th Cir. Nov. 28, 2005) (citing *Thompson v. Haley*, 255 F.3d 1292, 1296 (11th Cir.2001), and *Rogers v. Richmond*, 365 U.S. 534 (1961) (which held, in a habeas case, that a confession was involuntary when the police pretended that, if the defendant did not confess, the defendant's ailing wife would be arrested)).

However, in considering the totality of the circumstances, it is important to keep in mind that in any arrest or custodial situation there is present a degree of duress.  The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's waiver or statements.  *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) (in discussing consent to search following arrest, asking: "In other words, was there a use of coercive tactics by the arresting officers such that the duress present in a particular exceeds the normal duress inherent in any arrest?"); *see also United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) (quoting *Jones*, *supra*).[6]

---

[6]    Moreover, while a defendant's mental condition is a " 'significant factor' " in the " 'voluntariness calculus,' " *Miller*, 853 F.2d at 1536 (quoting *Connelly*, 479 U.S. at 520), even the interrogator's knowledge that a suspect may have mental

Separate and apart from compliance with *Miranda*, the Government also must establish that a custodial defendant's statements were voluntary. *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements. Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."); *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and *Jackson v. Denno*, 378 U.S. 368 (1964), protect Fifth Amendment rights, *Jackson* "raises an issue distinct from the *Miranda* question in determining a confession's admissibility and [t]hus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness). A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *United States v. Veal*, 153 F.3d 1233, 1244 n.14 (11th Cir. 1998) (internal quotations omitted).

Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver. "The standard for evaluating the voluntariness of a confession is whether a person made an independent and informed choice of his own free will, possessing the

---

problems does not make the suspect's statement involuntary unless " '[t]he police exploited this weakness *with coercive tactics*.' " *Miller*, 853 F.2d at 1357 (quoting *Connelly*, 479 U.S. at 521 (emphasis in *Miller*)).

18

capability to do so, his will not being overborne by the pressures and circumstances swirling around him. Voluntariness depends on the totality of the circumstances and must be evaluated on a case-by-case basis." *United States v. Rivera*, 372 Fed. Appx. 958, 963 (11th Cir. Apr. 14, 2010) (quoting *Castaneda-Castaneda*, 729 F.2d at 1363). Again, however, the absence of official coercion is a *sine qua non* of voluntariness. *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *Castaneda-Castaneda*, 729 F.2d at 1362-63. Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (determining that a false statement by law enforcement that codefendant had confessed and implicated the defendant did not render the defendant's statement involuntary), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice. Similarly, a mere admonition to the accused to tell the truth does not render a statement involuntary. *United States v. Hipp*, 644 Fed. Appx. 943, 947 (11th Cir. Mar. 1, 2016) (citing *United*

19

*States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983)); *United States v. Barfield*, 507 F.2d 53, 56 (5th Cir. 1975) ("[A]n officer's admonition to tell the truth . . . does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."); *see also United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (pounding fist on the table while accusing defendant of lying does not negate voluntariness); *United States v. Bailey*, 979 F. Supp. 1315, 1318 (D. Kan. 1997) ("Merely exhorting [defendant] to start telling the truth did not render his confession involuntary.").

20

### D.     Discussion

The Court concludes that Kim intelligently, knowingly and voluntarily waived his *Miranda* rights and his subsequent statements were voluntary.[7]

#### 1.     Miranda *waiver*

The totality of the circumstances establishes that Kim's waiver of his *Miranda* rights was properly obtained.

Although the record is silent as to Kim's educational level or intelligence, no one factor is determinative in the voluntariness mix.  *Cf. Connelly*, 479 U.S. at 164 (rejecting lower court's conclusion that one factor, such as defendant's mental condition, "by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' ").  Moreover, Kim was read the *Miranda* rights from a preprinted form, and initialed each of the rights, thus establishing that he was made aware of what rights he possessed.  Further, the evidence

---

[7]     Kim did not raise a Fourth Amendment claim in his post-evidentiary hearing brief, and as a result the Court concludes that he abandoned any such claim. In any event, the return of a true bill of indictment, which establishes probable cause, authorizes the arrest of a person charged in the indictment.  *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (A facially valid indictment returned by a properly constituted grand jury "conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry.") (citations omitted, punctuation marks altered).

AO 72A
(Rev.8/82)

is undisputed that he was not tricked in any way into signing the waiver, and thus the Court concludes that his waiver was knowingly made.

Second, the record establishes that Kim understood his rights. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("The prosecution must make the additional showing that the accused understood these rights."). He acknowledged understanding his rights on the *Miranda* form. Gov't Exh. 1 ("I understand what my rights are.").

The Court rejects Kim's argument that his waiver was not intelligent because he was not advised of the charges against him or the topics about which the agents intended to question him. The Supreme Court has " 'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' " *United States v. Barner*, 572 F.3d 1239, 1244 (11th Cir. 2009) (quoting *Moran*, 475 U.S. at 422, and citing *Spring*, 479 U.S. at 576-77). In *Barner*, the court rejected the appellant's complaint that his waiver was not knowing and voluntary because he was told that he was being questioned about a home invasion but ended up being questioned about drugs. Thus, even if Kim was not told in advance about the questioning's subject matter, this failure is not determinative as to the legality of his waiver.

22

Further support for this conclusion is gleaned from *Spring*, where the defendant was arrested on federal firearms violations, was informed of and waived his *Miranda* rights, and during the interrogation was also questioned about a murder. The defendant claimed that the failure to inform him of all potential subjects of interrogation constituted police deception rendering the waiver of his *Miranda* rights involuntary. The Supreme Court rejected that argument. The Court first explained the nature of the Fifth Amendment right and the safeguards established in *Miranda*. *Spring*, 479 U.S. at 572 (footnotes omitted). The Court went on to find that there was no *Miranda* violation, explaining "[t]his Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline to do so today." *Id.* at 576. The Court further noted, "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.* at 577.

As a result of *Spring* and *Barner*, Kim's reliance on *Carter v. Garrison*, 656 F.2d 68 (4th Cir. 1981), and *Schenk v. Ellsworth*, 293 F. Supp. 26 (D. Mont. 1968), is unhelpful. *Carter* and *Schenk* are both based on reasoning similar to that in *United*

23

States v. McCrary, 643 F.2d 323 (5th Cir. Unit B 1981).  In *dicta*, the *McCrary* court stated that a *Miranda* waiver could not be voluntary in the absence of evidence that the defendant knew what crime he was being questioned about, *id.* at 330,[8] relying, in part, on *Schenk*, *id.* at 329.  However, *McCrary* is no longer valid in light of *Spring*, which reversed the Colorado Supreme Court's reliance on cases which reasoned, like *McCrary*, that a suspect's awareness of the crime about which he would be questioned was determinative.  *See Spring*, 479 U.S. at 571 & n.3.  Thus, by implication at least, *Carter* and *Schenk* also no longer stand for valid principles of law.

Further, although there is no evidence that the agents advised Kim of the charges contained in the indictment upon which he was arrested, it is undisputed that they advised him during the interview that he was suspected of committing extortion, and in response he denied that he extorted anyone.  T25-26.  Therefore, Kim was aware of the subject matter of the questioning.

The Court also rejects Kim's argument that he did not intelligently waive his rights because the rights form waiver only went to his Sixth Amendment right to counsel.  In fact, the waiver portion of the form provided that he was "willing to answer

---

[8]      The *McCrary* court found harmless any error as to the *Miranda* waiver. *McCrary*, 643 F.2d at 330.

24

questions without a lawyer present," Gov't Exh. 1, and thus this language implicated both his Sixth Amendment right counsel and his Fifth Amendment right to remain silent, because in addition to agreeing to forego a lawyer, he consented to answer questions.

Therefore, his waiver was intelligently made.

Finally, the Court concludes that Kim's waiver of his *Miranda* rights was voluntary. A "signed *Miranda* waiver is usually strong evidence that the defendant waived his rights." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010); *United States v. Degaule*, 797 F. Supp. 2d 1332, 1378 (N.D. Ga. 2011) (Story, J., *adopting* Vineyard, M.J.) (citation omitted); *see Butler*, 441 U.S. at 373 ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."). *Cf. Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. . . . And when a defendant is read his *Miranda* rights (which include the right to have counsel present during

interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the Fifth Amendment[.]) (internal citation omitted).

The Court similarly rejects Kim's argument that the circumstances of his arrest adversely affected his waiver (or the voluntariness of his subsequent statements). Kim's arrest, although certainly subjectively unnerving and frightening, was not objectively or excessively violent. The agents knocked on his door, and Kim answered it. There is no evidence that in handcuffing him the agents manhandled him, applied excessive force or otherwise mistreated him. Moreover, once at the Buckeye Building, although he remained handcuffed in the front, there is no evidence that any force was used against him. *Cf. United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (holding that Rouco's confession was not involuntary where he was placed face-down on a hot parking lot pavement, handcuffed, detained at gunpoint, and subsequently placed in an un-air conditioned squad car with the windows rolled up for twenty minutes because "any physical discomfort Rouco may have suffered at the arrest scene was not caused intentionally but stemmed from the agents' preoccupation with [the victim's] condition"); *United States v. Caramian*, 468 F.2d 1369, 1370 (5th Cir. 1972) (confession not coerced where it occurred after *Miranda* warning administered

26

following "abrupt[ ]" arrest of Spanish-speaking alien who was stripped naked and searched by twelve armed government agents on a New York City street); *see also United States v. Bushay*, 859 F. Supp. 2d 1335, 1354 (N.D. Ga. 2012) (Batten, J., *adopting* Baverman, M.J.) ("Although the agents used physical force to secure Bushay's arrest, they did not use force after Bushay was restrained.  Once inside the interrogation room, the agents did not subject Bushay to a long interrogation, apply any physical force, or make any promises.   Thus, despite Bushay's dramatic characterization of his arrest and questioning, the Court agrees with [the] Magistrate Judge [] that the agents did not coerce, deceive or intimidate Bushay into waiving his rights.").   By the time Kim was subjected to questioning, almost one and a half hours had elapsed since his arrest, thus limiting any impact of the circumstances of his arrest, but also demonstrating that he was not held an inordinate amount of time until he was questioned.  Moreover, the request to waive his rights came almost immediately after he was brought into the interview room.  Although he was handcuffed in the front, "[t]he use of handcuffs does not establish coercion." *Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983); *see also United States v. Manson*, No. 1:11-CR-13-AT-LTW-2, 2012 WL 2861595, at *2 (N.D. Ga. July 11, 2012) ("[W]hile the Defendant's interrogation while he was handcuffed and under arrest

27

might have carried some inherent intimidation, the overall circumstances of the interrogation were not sufficiently coercive as to vitiate the voluntariness of Defendant's statements.") (footnote and citation omitted).  Further, the Court has not been advised of, and the Court's independent research has not located, any case in which a violation of Federal Rule of Criminal Procedure 4(c)(3)(A), requiring an arrestee to be advised of the offense for which he is being arrested, was held to be remedied by suppression of subsequently-made statements.

Moreover, the failure of law enforcement to record the interview rendered neither the *Miranda* waiver nor the subsequent statements involuntary.  *United States v. Valdez*, 880 F.2d 1230, 1233 (11th Cir. 1989) (finding inculpatory statements admissible although officers failed to take notes or record statements); *see also United States v. Boston*, 249 Fed. Appx. 807, 810 (11th Cir. Oct. 4, 2007) (rejecting appellant's claim that failure of law enforcement to record his interview with agents "violate[d] his privilege against self-incrimination, his right to counsel, and his due process rights to a fair trial").

Thus, the Court concludes that Kim's waiver of rights was knowingly, intelligently and voluntarily made.

28

### 2.      *Voluntariness of statements*

Kim's statements likewise were voluntary for many of the same reasons that his *Miranda* waiver of rights was voluntary.  There is no evidence that anything that the agents said or did overbore Kim's will and coerced him into answering their questions.  Similarly, there is no evidence that physical coercion was applied or threatened.  The questioning last approximately one hour, which is not lengthy.  *Hall v. Thomas*, 611 F.3d 1259, 1289 (11th Cir. 2010) (interrogation for a little over one hour not an extended period of time).  He was afforded something to drink.  That he initially denied involvement or presence at the scene of the assault and later appears to have admitted some facts after being confronted with contrary information, by itself, does not render the subsequent statements coerced.  *Lee v. Crews*, No. 5:12-CV-00234-MP-CJK, 2015 WL 2064249, at *28 (N.D. Fla. May 4, 2015) (noting that habeas petitioner's initial denial, in and of itself, does not evidence coercion, trickery, or any other police misconduct; "[t]his is especially true here, where the change in petitioner's story came after law enforcement confronted petitioner with contrary information from their investigation"); *Taylor v. Simpson*, No. CIV.A. 5:06-181-DCR, 2014 WL 4928925, at *6 (E.D. Ky. Sept. 30, 2014) ("The mere fact that Wade had initially denied any

29

involvement in the crimes and confessed only after receiving notice that he had been identified in the lineup does not render the confession involuntary.").

Nor were Kim's statements involuntary because the agents told him that he was facing twenty years, in the absence of evidence that he was promised that his sentence would be lighter if he cooperated. *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994) (quotation omitted); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government."). In addition, as noted, the mere fact that the agents implored him to tell the truth did not render his statements involuntary. *Hipp*, 644 Fed. Appx. at 947. Similarly, the agents' telling Kim that they knew what happened, or that co-defendants were telling them what actually happened, did not render Kim's statements involuntary. *Frazier*, 394 U.S. at 739 (1969) (holding police officer's false statement to defendant that companion confessed insufficient to make otherwise voluntary statement involuntary).

Finally, even if Kim recognized that Gant and TFO Kim were, unlike Agent and Agent Kim, carrying their firearms during the questioning, such fact does not render

30

his statements involuntary. *Cf. United States v. Stinson*, No. 15-12739, 2016 WL 4204790, at *2 (11th Cir. Aug. 10, 2016) (finding statements voluntary under totality of the circumstances, in part because "while the officers had visible firearms, the weapons remained in their holsters throughout the interview").

Therefore, the Court concludes that Kim's statements were voluntarily obtained.

Because the Government satisfied its burden under *Miranda* and Kim's statements were voluntary, the Court **RECOMMENDS** that Kim's motions to suppress statements, [Docs. 77, 99], be **DENIED**.

## II.   *Kim's Motion to Sever Counts, [Doc. 170]*

Kim moves to sever counts because although he is charged in Counts One, Three, Five, and Six, he is not named in Counts Two, Four, and Seven through Fourteen, which involve allegations against different victims or assert drug crimes. He argues that, as a result, he will be unduly prejudiced at a joint trial of these other allegations, and therefore, the Court should sever the counts pursuant to Federal Rule of Criminal Procedure 14 because the indictment alleges multiple acts in which the Government alleges no involvement by Kim. [Doc. 170 at 4-6].

The Government responded earlier to motions to sever filed by other defendants, arguing that the counts were properly joined under Federal Rule of Criminal

31

Procedure 8(a), because they are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan, [Doc. 109 at 3-7], and that the defendants should be tried together because they were named in one overarching conspiracy, headed by Chung, to make money through, *inter alia*, extortionate debt collection and drug trafficking, [*id.* at 7], and the fact that there is differing quantities of evidence against various defendants is not grounds to override the substantial interest in judicial economy in having a joint trial.  [*Id.* at 7-9].

Since Kim is not alleging misjoinder but only prejudicial joinder, the Court will evaluate the motion on that ground only.  Rule 14(a) of the Federal Rules of Criminal Procedure allows for severance if joinder "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  However, "there is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985) ("The general rule in [the Eleventh Circuit] is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases.").  Rule 14(a) requires "a [district] court to balance the rights of the defendant[ ] and the government to a trial that is free from the prejudice" against the public interest in judicial economy. *United States v. Novaton*, 271 F.3d 968,

989 (11th Cir. 2001) (quotation omitted) (reviewing the denial of a codefendant severance motion).

A severance under Rule 14 should be granted only if the defendant can demonstrate that a joint trial would result in specific and compelling prejudice to the conduct of his defense. *United States v. Marszalkowski*, 669 F.2d 655, 660 (11th Cir. 1982). The test for compelling prejudice is "whether under all the circumstances of a particular case, as a practical matter, it is within the capacity of the jury to follow the [instructions] and accordingly . . . appraise the independent evidence against each defendant's own acts, statements and conduct." *United States v. Kabbaby*, 672 F.2d 857, 861 (11th Cir. 1982) (citations omitted). The burden is on the defendant to demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense." *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997); *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983); *United States v. Melvin*, 143 F. Supp. 3d 1354, 1368 (N.D. Ga. 2015). " 'This is a heavy burden, and one which mere conclusory allegations cannot carry.' " *United States v. Walser*, 3 F.3d 380, 386 (11th Cir. 1993) (quoting *United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir. 1993)). The reason that conclusory allegations do not satisfy the defendant's burden is that courts presume that jurors can compartmentalize evidence by respecting limiting

33

instructions specifying what evidence may be considered against what defendant. *United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) (citing *Schlei*, 122 F.3d at 984); *see also United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (in affirming denial of severance motion asserting grounds that codefendant might testify for defendant, holding that severance not necessary upon defendant's "generalized vague and speculative assertions").

In satisfying this burden, it is not enough for the defendant to show that acquittal would be more likely if he was tried separately, since some degree of bias is inherent in a joint trial. *Alvarez*, 755 F.2d at 857 (citing *Walker*, 720 F.2d at 1533, and *Marszalkowski*, 669 F.2d at 660).  Furthermore, a defendant does not suffer "compelling prejudice" simply because much of the evidence at trial is applicable only to his codefendants. *Id.* (citing *United States v. Zielie*, 734 F.2d 1447, 1464 (11th Cir. 1984), and *United States v. Berkowitz*, 662 F.2d 1127, 1135 n.8 (5th Cir. Unit B 1981)); *see also United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998) (same).  Also, evidence of the reputation or past crimes of a codefendant does not ordinarily justify severance. *See United States v. Howell*, 664 F.2d 101, 106 (5th Cir. Unit B 1981); *United States v. Ocanas*, 628 F.2d 353, 359

34

(5th Cir. 1980); *United States v. Perez*, 489 F.2d 51, 67 (5th Cir. 1973), and cases cited therein.

In order to overcome the joint-trial presumption and to establish that severance of defendants is mandated pursuant to Rule 14, a defendant must not only show specific prejudice but also that " 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " *Blankenship*, 382 F.3d at 1123 (citation omitted). Generally, a jury is prevented from making a reliable judgment in three situations. "First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant." *Id.* However, this situation does not involve the mere disparity in the quality or amount of evidence introduced against one or more defendants and only applies where there is a minimal chance that limiting instructions will provide adequate relief. *See United States v. Baker*, 432 F.3d 1189, 1236 (11th Cir. 2005) (holding that "a defendant does not suffer 'compelling prejudice simply because much of the evidence at trial is applicable only to his co-defendants,' . . . even when the disparity is 'enormous' ") (quoting *Schlei*, 122 F.3d at 984).

35

Severance is also mandated upon a showing of prejudice "in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." *Blankenship*, 382 F.3d at 1124. And, "[f]inally, severance is required . . . where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants." *Id.* at 1125.

Even if a defendant can show some prejudice, a defendant is entitled to severance only if that "prejudice flowing from a joint trial is clearly beyond the curative powers of precautionary instruction." *United States v. Morrow*, 537 F.2d 120, 126 (5th Cir. 1976); *see also Puiatti v. McNeil*, 626 F.3d 1283, 1310 (11th Cir. 2010) (recognizing that defendant seeking severance has a "heavy burden" of demonstrating compelling prejudice which occurs only where there is a serious risk that a joint trial (1) "would compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence.") (citations omitted); *Walser*, 3 F.3d at 385 (recognizing that a court errs in denying a severance

36

motion if the denial "result[ed] in compelling prejudice against which [it] could offer no protection").

Finally, whether to grant a motion to sever involves an exercise of the court's considered discretion.  *United States v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992).

The only ground raised by Kim in support of severance is that he is not charged in the counts relating to distribution of drugs.  Facially, some case law supports a severance on this ground.  *See United States v. McLain*, 823 F.2d 1457, 1467 (11th Cir. 1987), *overruled on other grounds as recognized by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989) (holding that severance should have been granted where defendants were joined under a RICO count containing two separate conspiracies, one drug-related and the other involving loansharking and bookmaking; although one of the defendants in the RICO count had absolutely no connection to the drug conspiracy and in fact was unaware of its existence, the jury was "deluged" with testimony concerning the violent and murderous actions of the narcotics conspirators); *United States v. Erwin*, 793 F.2d 656, 666 (5th Cir. 1986) (holding that severance of a particular co-defendant was required because "[t]he charges against her were only peripherally related to those alleged against the other [co-defendants, and] [a]s the trial progressed it became increasingly apparent that very little of the mountain of evidence

was usable against her"); *United States v. Sampol*, 636 F.2d 621, 646 (D.C. Cir. 1980) (finding severance was required where a defendant was tried for making false statements to a grand jury and misprision of felony in the same trial as co-defendants accused of "the bombing murder of two people"); *United States v. Maisonet*, No. S3 97 Cr. 0817, 1998 WL 355414, at *6 (S.D.N.Y. July 1, 1998) ("[The defendant] is not charged with any act of violence, nor is he charged with participating in the possession, sale, or distribution of narcotics.  Given the nature and extent of evidence that the Government will likely introduce against both groups of co-defendants, the potential for prejudice against [the defendant] arising from a joint trial with either group is substantial.").

Although these cases might lend some credence to Kim's argument, the current action is sufficiently different from those cases to mandate severance.  In *McLain*, the prejudice arose from the joinder of two separate and unrelated conspiracies under a single count, one of which had no application to a defendant charged under that count and which further entailed evidence of violent activity.  That situation is not presented in the case at bar, where a single conspiracy with one objective is charged.  The overall purpose of the conspiracy was to generate money for Chung and his associates and alleges that drug trafficking and other illegal activities fostered the defendants'

38

extortionate collection of debts.  [Doc. 259 at 2].  This allegation, which asserts a connection between the drug trafficking and extortionate debt collection, distinguishes this case from *McLain*, the case which might be the closest analogue to the instant matter.  In addition, Kim has not shown how jurors would be incapable of  following the Court's limiting instructions and appraise the independent evidence against him solely on his own acts, statements, and conduct in relation to the allegations contained in the indictment and rendering a fair and impartial verdict.  *Walser*, 3 F.3d at 386-87.

In addition, the description of the facts and bases for decision in *Erwin*, *Sampol*, and *Maisonet* demonstrate that these cases are distinguishable form the present action. Furthermore, if Defendant demonstrates compelling prejudice at trial, the trial court can order that the trial of the counts be severed.  *See, e.g., United States v. Kopituk*, 690 F.2d 1289, 1316 (11th Cir. 1982) (noting that the trial court has a "continuing duty at all stages of the trial to grant a severance if prejudice does appear" (internal quotation omitted)).

Accordingly, the undersigned **RECOMMENDS** that Kim's motion to sever counts be **DENIED**.

39

**III.    Kim's Motion to Sever Defendant (Bruton), [Doc. 75], and Chung and Lee's Objections to the Government's Proposed Redactions**

Kim moved to sever his trial from any defendant who gave statements implicating him.  [Doc. 75].   In response, and pursuant to the Court's Order, the Government filed proposed redactions, [Doc. 175], and then Kim, Lee, and Chung filed objections, [Docs. 184, 185, 186, respectively].  The Court will discuss the objections in the order in which they were filed.  In discussing the various objections, the Court will not discuss those statements or redactions as to which the defendants agreed, nor will it discuss one defendant's objections as they relate to another defendant's *Bruton* interests, for example, a claim by Kim that a partial redaction did not protect Chung's *Bruton* rights.

**A.    Kim's objections to redactions in his statement**

Kim objects to the redaction from his statement that "KIM has never extorted money from anyone not even once."  [Doc. 184 at 2 (quoting [Doc. 175-3 at 1])].  Kim's objection is based on the fact that the statement does not implicate any defendant's cross-examination rights.  The Court agrees that the statement is not subject

40

to redaction pursuant to *Bruton v. United States*, 391 U.S. 523 (1968).[9]  Thus, the

---

[9]      In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that post-arrest statements made by non-testifying co-defendants that facially incriminate other defendants are inadmissible into evidence because such statements violate the Sixth Amendment rights of the other defendants to confront and cross-examine adverse witnesses.  The Supreme Court concluded that "where the powerfully incriminating extra-judicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements.  *Bruton*, 391 U.S. at 135-36.

In *Gray v. Maryland*, 523 U.S. 185 (1998), the Court, applying *Bruton*, held that the redaction of the defendant's name from a confession of a co-defendant by substituting a blank space or the word "deleted" for the defendant's name, did not adequately protect a defendant's Sixth Amendment rights to confront witnesses.  The *Gray* decision distinguished that factual scenario from the redaction in *Richardson v. Marsh*, 481 U.S. 200, 203-04 (1987), where the redaction omitted any mention of the co-defendant then on trial in the involvement of the crime.

In *Gray* , a confession written by a co-defendant that explicitly referred to the defendant was redacted to eliminate any reference to the defendant.  However, the defendant's name was replaced with the word "deleted" or was simply left as a blank space.  *Gray* , 523 U.S. at 188.  When the government's law enforcement witness read the co-defendant's confession into evidence, he said "deleted" wherever the defendant's name had been redacted.  The witness then testified that following the receipt of the co-defendant's confession, he arrested the defendant.  The Supreme Court concluded that the "obviously redacted confession" violated *Bruton* because it "pointed directly to the defendant."  *Id.* at 194.  Thus, the Court concluded that the redacted confession "facially incriminated" the defendant and "involved inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."  *Id.*  In reaching this conclusion, the Court distinguished its decision in *Richardson* where the redacted confession "became incriminating 'only when linked with evidence introduced later at trial.'"  *Id.* at 196 (quoting *Richardson*, 481 U.S. at 208).

41

undersigned **RECOMMENDS** that Kim's objection under *Bruton* be **SUSTAINED**. Whether the Government chooses to use the statement or whether Kim can introduce the exculpatory statement is **DEFERRED** to the District Judge.

Next, Kim objects to the Government's redaction in the fifth paragraph that the assault on Victim No. 1 took place at the W, contending that he stated that the assault took place at the Khabin (also referred to as Gah Bin). [Doc. 184 at 3 (citing [Doc. 175-3 at 1])]. The Government is not intending on using this statement, whether it was memorialized correctly or not. It will be an issue at trial where the assault occurred, if at all. Therefore, the Court **RECOMMENDS** that Kim's objection be **OVERRULED** on *Bruton* grounds. Assuming the District Judge agrees with the Court's recommendations as to *Bruton* redactions, the undersigned further **RECOMMENDS** that Kim's motion to sever, [Doc. 75], be **DENIED**.

## B.   Lee's Objections

Lee first objects that redactions in Chung's statements violate the rule of completeness. When a court redacts a statement to resolve a potential *Bruton* problem, "the rule of completeness is violated only when the statement in its edited form . . . effectively distorts the meaning of the statement or excludes information substantially exculpatory of the nontestifying defendant." *United States v. Persaud*,

42

605 Fed. Appx. 791, 798 (11th Cir. Mar. 20, 2015) (quoting *United States v. Turner*, 474 F.3d 1265, 1277 (11th Cir. 2007)), *cert. denied sub nom. Wilson v. United States*, 136 S. Ct. 533 (2015), and *cert. denied*, 136 S. Ct. 534 (2015).

Thus, Lee states that he intends to ask the proponent about two statements in Chung's post-arrest statement, "Andy LNU was also present at the airport" and "CHUNG advised that those individuals in the photograph are Andy's friend and that they were just there for the ride." [Doc. 185 at 4-5 (quoting [Doc. 175-1 at 2])]. The "Andy" in these statements is defendant Vorasith, who has pleaded guilty. Therefore, no *Bruton* issue exists. It is therefore **RECOMMENDED** that Lee's objection be **OVERRULED AS MOOT**. For the same reason, it is **RECOMMENDED** that Lee's objections to Vorasith's statement, [Doc. 175-2], be **OVERRULED AS MOOT**.

Lee next objects to David Choi's statements that refer to "the defendants." [Doc. 185 at 8-9 (citing [Doc. 175-4 at 1])]. The Court agrees that, in light of the representations presently in front of the Court, the jury would logically conclude from the other evidence in the record that the neutral pronoun or general word indeed represented the defendants, including Lee. *United States v. Foree*, 43 F.3d 1572, 1578 (11th Cir. 1995); *United States v. Mendoza-Cecelia*, 963 F.2d 1467,

AO 72A
(Rev.8/82)

1481 (11th Cir. 1992).  Accordingly, the undersigned **RECOMMENDS** that Lee's

objection be **SUSTAINED**.

Lee next objects to the redaction from his statement describing Lee

accompanying Chung to the airport, with the intended redaction reading, "Eugene then

stopped at the airport first to talk to an acquaintance who owed him some money.

Thomas [Lee] said Eugene told him to stand nearby then met with

someone. . . .  Thomas did not hear any of the conversation.  Thomas said that

afterwards, one of the people who Eugene met at the airport was bragging about taking

a watch from the other person they met at the airport."  [Doc. 185 at 7-8 (quoting

[Doc. 175-5 at 1-2])].  Lee contends that by eliminating these statements, the

Government is attempting to make Lee's statement more inculpatory than it was

portrayed in Lee's statement.  The Court agrees, and therefore **RECOMMENDS** that

the Government's redaction of Lee's statement not be accepted in its present form.

### C.     *Chung*

Chung first objects to the Government's proposed redactions that leave in Kim's

statement that "Kim and Lee tried to break the fight between . . . and Chung,"

[Doc. 186 at 3 (quoting [Doc. 175-3 at 1])], and "[t]he conversation between Chung and

. . . was heated and they began yelling at each other."  [*Id.* (quoting [Doc. 175-3 at 2])].

44

The Court agrees that in their present form, these two statements violate Chung's *Bruton* rights, and thus **RECOMMENDS** that before these statements can be introduced, additional redaction(s) must occur.

Next, the Government apparently is not intending to redact the statement attributed to Kim that "[i]t happened so fast that KIM can only remember what he actually saw," [Doc. 175-3 at 2], so Chung's objection (requesting that this statement be unredacted), [Doc. 186 at 4], is **RECOMMENDED** to be **DENIED AS MOOT**.

Next, the Court **RECOMMENDS** that Chung's objections to the final paragraph of Kim's statement, in addition to the intended redaction of the first two sentences,[10] be **SUSTAINED**.   Chung would be unable to cross-examine Kim about these statements.

---

[10]      The portion of the paragraph that Chung seeks redacted is as follows:

KIM eventually got his money back from CHUNG while CHUNG was still partner with . . . .   . . . might have given KIM some money but not as a payment for CHUNG.   KIM has never threatened . . . for money. KIM does not remember that he had dinner with CHUNG at the night of . . .'s nor JINHO KONG was there with him at the . . .'s business.

[Doc. 175-3 at 2].

Finally, because Vorasith has entered a guilty plea and thus is available of cross-examination, the Court **RECOMMENDS** that Chung's *Bruton* objections to the redactions in Vorasith's statement be **OVERRULED**.

## IV.    *Conclusion*

The Court **RECOMMENDS** that Kim's motions to suppress statements, [Docs. 77, 99], be **DENIED**, Kim's motion to sever counts, [Doc. 170], be **DENIED**, and that Kim's motion to sever based on *Bruton*, [Doc. 75] be **DENIED** if the District Judge agrees with the recommendation as to further redactions pursuant to Kim's objections, [Doc. 184]. The Court further **RECOMMENDS** that the objections, [Docs. 184 (Kim), 185 (Lee) and 186 (Chung)], to the Government's *Bruton* redactions, [Doc. 175], be **SUSTAINED IN PART AND OVERRULED IN PART** as indicated in this R&R.

Having ruled on all matters referred, the Court **CERTIFIES THE CASE READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this   12th   day of September, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

46